**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION**

| | | |
|---|---|---|
| R.I. SPIECE SALES COMPANY, INC. | ) | |
| and THOMAS G. SPIECE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NO.: 1:03-CV-175 |
| | ) | |
| BANK ONE, NA, | ) | |
| | ) | |
| Defendant. | ) | |

**OPINION AND ORDER**

Indiana retailer Spiece Sales filed for bankruptcy in December 2000, and within six months of filing had closed four of its seven stores. After coming to an agreement with its largest secured creditor, Bank One, and obtaining a plan for emerging solvent from bankruptcy, Spiece Sales sought new financing to maintain inventory in its remaining stores and to recover from the financial difficulties of the past. Ultimately, financing for the three remaining stores was not forthcoming, and Spiece Sales closed two of them in 2002.

Spiece Sales blames the closure of these two stores on the wrongdoing of Bank One. The Plaintiffs state that the bank left liens on Spiece Sales' inventory even after all obligations to the bank had been satisfied. The sullied title on this inventory prevented another bank from using the inventory as collateral on new loans. Spiece Sales' Mishawaka store closed its doors for the last time while these liens were being sorted out.

After the original liens were lifted and a few months had passed, an instrumentality of Bank One filed continuation statements for the liens over Spiece Sales' inventory. Though the bank acknowledged that these liens were filed in error, Spiece Sales claims that the new liens prevented

them from obtaining much-needed financing. Spiece Sales' Fort Wayne store closed during the period shortly after the refiling of these liens.

This Order addresses the Defendant's Motion for Summary Judgment [DE 55].


## PROCEDURAL HISTORY

On February 11, 2003, Plaintiffs Spiece Sales Company and Thomas G. Spiece sued Defendant Bank One in Allen Superior Court. On May 14, 2003, the Defendant removed the action to federal court, invoking the Court's diversity jurisdiction and bankruptcy jurisdiction.

On May 30, 2003, the Defendant moved to dismiss the Plaintiff's Complaint under Federal Rule of Civil Procedure 12(b)(6). On May 30, 2003, the Defendant also filed a Motion to Refer Removed State Court Action to Bankruptcy Court.

On July 17, 2003, the Plaintiffs filed an Amended Complaint. Plaintiff Spiece Sales alleged negligence, slander of title, tortious interference with business relationships, conversion, and breach of contract. Plaintiff Thomas G. Spiece asserted claims for tortious interference with business relationships and breach of contract. These claims were based on the Defendant's failure to release its lien interest on Spiece Sales' inventory and the later refiling of lien statements against that inventory. Concurrent with the Amended Complaint, the Plaintiffs filed their Response to the Defendant's 12(b)(6) motion. On July 31, 2003, the Defendant filed a Motion to Dismiss Amended Complaint or, in the Alternative, for a More Definite Statement and, additionally, filed a reply in support of its motion to remove the action to bankruptcy court.

On April 27, 2004, the Court issued an Order denying the Defendant's Motion to Dismiss as moot, denying the Defendant's motion to Refer the case to Bankruptcy Court, denying the

Defendant's Motion to Dismiss Amended Complaint, and denying the Defendant's alternative Motion for More Definite Statement.

On December 14, 2004, the Defendant filed a Motion for Summary Judgment. On January 18, 2005, the Plaintiff filed a Response in opposition to the Defendant's Motion for Summary Judgment. On February 2, 2005, the Defendant filed a Reply in support of its motion.

## STANDARD FOR SUMMARY JUDGMENT

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "In other words, the record must reveal that no reasonable jury could find for the nonmoving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.*, 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted). Rule 56(c) further requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment bears the initial responsibility of informing a court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. The moving party may discharge its "initial responsibility" by simply "'showing'—that is, pointing out to the

district court—that there is an absence of evidence to support the non-moving party's case." *Id.* at 325. When the non-moving party would have the burden of proof at trial, the moving party is not required to support its motion with affidavits or other similar materials negating the opponent's claim. *Id.* at 323, 325; *Green v. Whiteco Indus., Inc.*, 17 F.3d 199, 201 n.3 (7th Cir. 1994); *Fitzpatrick v. Catholic Bishop of Chicago*, 916 F.2d 1254, 1256 (7th Cir. 1990). However, the moving party may, if it chooses, support its motion for summary judgment with affidavits or other materials and thereby shift to the non-moving party the burden of showing that an issue of material fact exists. *Kaszuk v. Bakery & Confectionery Union & Indus. Int'l Pension Fund*, 791 F.2d 548, 558 (7th Cir. 1986); *Bowers v. DeVito*, 686 F.2d 616, 617 (7th Cir. 1982); *Faulkner v. Baldwin Piano & Organ Co.*, 561 F.2d 677, 683 (7th Cir. 1977).

Once a properly supported motion for summary judgment is made, the non-moving party cannot resist the motion and withstand summary judgment by merely resting on its pleadings. Fed. R. Civ. P. 56(e); *Donovan v. City of Milwaukee*, 17 F.3d 944, 947 (7th Cir. 1994). Federal Rule of Civil Procedure 56(e) establishes that "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts to establish that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Anderson v. Liberty Lobby*, 477 U.S. 242, 248–50 (1986). Thus, to demonstrate a genuine issue of fact, the non-moving party must do more than raise some metaphysical doubt as to the material facts; the non-moving party must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *Juarez v. Ameritech Mobile Communications, Inc.*, 957 F.2d 317, 322 (7th Cir. 1992). Conclusory allegations and self-serving affidavits, if not supported by the record, will not preclude summary judgment. *Haywood v. N. Am. Van Lines, Inc.*, 121 F.3d 1066,

1071 (7th Cir. 1997).

In viewing the facts presented on a motion for summary judgment, a court must construe all facts in a light most favorable to the non-moving party and draw all legitimate inferences and resolve all doubts in favor of that party. *NLFC, Inc. v. Devcom Mid-Am., Inc.*, 45 F.3d 231, 234 (7th Cir. 1995); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994); *Beraha v. Baxter Health Care Corp.*, 956 F.2d 1436, 1440 (7th Cir. 1992). A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson*, 477 U.S. at 249–50; *Doe*, 42 F.3d at 443.

Resolving all genuine disputes and drawing all reasonable inferences in the Plaintiffs' favor, the facts assumed to be true for the purposes of ruling on the Defendant's Motion for Summary Judgment are as follows:

## FACTS

R.I. Spiece Sales Co., Inc., is an Indiana-based retailer of sporting goods, jeans, and similar items. Plaintiff Thomas G. Spiece is the sole shareholder of Spiece Sales. Spiece Sales relied on a line of credit for its usual retail operations, and Defendant Bank One served as Spiece Sales' lender. The Defendant secured the line of credit through liens on the company's inventory.

On December 21, 2000, Spiece Sales filed a Chapter 11 bankruptcy case in which Bank One was the largest secured creditor. At the time of the bankruptcy proceeding, Spiece Sales owed the bank $2,975,000 and Mr. Spiece owed the bank $300,000 in a separate loan. On June 6, 2001, Bank One and Spiece Sales entered into an Agreed Order, which set forth the terms by which Spiece Sales

could satisfy its loan indebtedness to Bank One. The Agreed Order also provided that the Bank would vote in favor of a plan of reorganization for Spiece Sales.

Section "m" of the Agreed Order provided that if Spiece Sales paid the Bank $1,750,000 and complied with the rest of the Agreed Order, "then the Bank shall release Debtor from any further obligation to Bank under the Company Loans and the Spiece Loan." On August 29, 2001, Spiece Sales made a final payment of $1,750,000 to Bank One. At the time this payment was made, the Indiana Secretary of State's UCC records contained financing statements in favor of Bank One, which perfected Bank One's liens on Spiece Sales' assets.

On November 9, 2001, Spiece Sales sent Bank One a "General Release" pursuant to Section "k" of the Agreed Order. Plaintiff Thomas Spiece also sent one or more letters to Bank One addressing the subject of Bank One's liens on Spiece Sales' inventory.

On December 26, 2001, the Bank voted in favor of Spiece Sales' plan of reorganization, as the Bank agreed do to in Section "l" of the Agreed Order.

On January 18, 2002, the Bankruptcy Court entered an order confirming Spiece Sales' plan of reorganization, and this Order explicitly approved and adopted the Agreed Order between the parties.

During this period, Spiece Sales also attempted to secure financing from other banks in order to continue its retail operations. On February 20, 2002, Spiece Sales received a letter from Tower Bank stating it would not consider Spiece Sales for a loan because of the UCC liens on record in Bank One's name.

On March 11, 2002, Plaintiff Tom Spiece sent a fax to Bank One requesting the release of the liens. The next day, Bank One filed two termination statements with the Indiana Secretary of

State.

Spiece Sales closed its Mishawaka store on March 29, 2002. Tom Spiece cited a lack of inventory as the reason the store had to be closed.

Bank One mailed copies of the termination statements for the liens to Spiece Sales on May 14, 2002. With the liens lifted, Spiece Sales made heightened efforts to secure a loan for its retail operations. Spiece Sales sent a letter to Tower Bank on May 20, 2002, informing it of the terminations and asking it to "get going" on a loan. However, there was a delay in Tower Bank's decision, as the loan officer took time off for a vacation and for health reasons.

On August 6, 2002, Bank One, through a servicing agent, filed two UCC continuation statements with respect to the previously-released liens on Spiece Sales' assets. The next day, Kevin Patrick of Tower Bank sent Spiece Sales a letter denying its loan application. He specifically cited the liens over Spiece Sales' inventory as a reason for the rejection. Mr. Spiece attempted to contact Bank One after this reinstatement of the liens, but he did not receive a response until he sent a letter to the Defendant on September 18, 2002. A Bank One employee called Mr. Spiece on September 20, 2002, to discuss the September 18 letter. On September 28, 2002, another Bank One employee informed Mr. Spiece that the Bank's records indicated that he still owed the bank over $1.5 million, though this debt was satisfied over a year earlier in accord with the Agreed Order.

On August 30, 2002—after the filing of the illicit continuation statements by Bank One and the rejection of Spiece Sales' loan request by Tower Bank, but before these liens were lifted—Spiece Sales closed its Fort Wayne "Fieldhouse" store. Mr. Spiece owned the Fieldhouse property in his personal capacity and received monthly rent from Spiece Sales and other tenants.

On October 3, 2002, Bank One's counsel sent a letter to Spiece Sales' counsel stating that

Bank One was not in fact claiming a lien over Plaintiff's inventory. Bank One filed termination statements with the Indiana Secretary of State's office for the second liens on October 8, 2002, twenty days after Mr. Spiece sent his letter requesting their removal.

## DISCUSSION

The Defendant seeks Summary Judgment on all counts of the Plaintiffs' Complaint.

## A. Breach of Contract

Spiece Sales alleges that the Defendant breached the Agreed Order approved by the bankruptcy court when it failed to lift the liens from Spiece Sales' inventory and when it imposed new liens in August 2002. The Defendant argues in response that (1) the Agreed Order is silent on the subject of UCC filings, and the UCC should govern the release of liens; (2) the Plaintiffs failed to mitigate any damages they may have suffered; and (3) the Agreed Order did not control any events after March 12, 2002.

### (1) *Breach of Contract for the Original Liens*

Agreed Orders from bankruptcy court act as contracts:

The Seventh Circuit has explained that "[a] confirmed plan of reorganization is in effect a contract between the parties and the terms of the plan describe their rights and obligations." *Ernst & Young LLP v. Baker O'Neal Holdings, Inc.,* 304 F.3d 753, 755 (7th Cir. 2002). The provisions of a confirmed plan bind the debtor and creditors in the same manner as a contract. *See In re Harvey,* 213 F.3d 318, 321 (7th Cir. 2000); *Envirodyne Indus., Inc. v. Viskase Corp.,* 183 B.R. 812, 818 (N.D. Ill.1995). There is no doubt that the principles of contract construction apply to confirmed plans, and that contract principles apply to the essential terms of a confirmed plan. *See In re Penrod,* 169 B.R. 910, 917 (N.D. Ind.1994), *aff'd,* 50 F.3d 459 (7th Cir.1995); *UNR Indus., Inc. v. Bloomington Factory Workers,* 173 B.R. 149, 157

(N.D. Ind.1994). A bankruptcy plan "bears close analogy" to a private contract, in the sense that it is created by offer, acceptance and negotiations. *UNR Indus., Inc.,* 173 B.R. at 157 (citing *In re L & v. Realty Corp.,* 76 B.R. 35, 37 (E.D.N.Y.1987)). However, a plan of reorganization also has been viewed as a consent decree or agreed order. *See id.* The Seventh Circuit has recognized that a confirmed bankruptcy plan "acts more or less like a court-approved contract or consent decree." *In re Harvey,* 213 F.3d at 321.

*In re Heartland Steel, Inc.,* 2003 WL 21508233, at *3 (S.D. Ind. June 26, 2003). The court

concluded:

A confirmed bankruptcy plan of reorganization is neither a mere contract, nor a court order. It is its own animal—a contract between the debtor and creditors that is made effective and binding by the bankruptcy court's confirmation order. All the terms and conditions of the plan are binding on the parties because the court's confirmation order gives them that effect. The plan is not a private business contract.

*Id.* at *4.

The Defendant claims that because the Agreed Order was silent on the UCC filings, and the

UCC requires an "authenticated demand" from the Plaintiffs to lift the liens,[1] the Defendant satisfied

any obligation it may have had by filing termination statements on March 12, 2002, after receiving

a fax from Mr. Spiece.

The UCC provides a default set of rules and standards that help the law recognize and

enforce accepted business practices. Ind. Code § 26-1-1-102(2).  However, parties are able to

contract around the UCC, and the plain meaning and intent of the parties can trump particular

provisions of the UCC that conflict with the intent of the contract. I.C. § 26-1-1-102(3); *Rheem Mfg.*

*v. Phelps Heating and Air Conditioning*, 746 N.E.2d 941, 950 (Ind. 2001) ("The UCC tells us that

---

[1] The Defendant cites Official Comment 2, Indiana Code § 26-1-9.1-513 ("Because most financing statements expire in five years unless a continuation statement is filed . . . no compulsion is placed on the secured party to file a termination statement unless demanded by the debtor), and Official Comment 3, Indiana Code § 26-1-9.1-513 ("A secured party's duty to send a termination statement arises when the secured party receives an authenticated demand from the debtor.").

one of its paramount concerns is enabling contracting parties to control their own relationship.").

Here, the terms of the Agreed Order, as accepted by the Bankruptcy Court, provided that, upon payment of an agreed amount and Plaintiffs' fulfillment of their other obligations as contained in the Agreed Order, the Defendant "shall release Debtor from any further obligation to Bank under the Company Loans and the Spiece Loan." (Agreed Order at § m.) This language of the Agreed Order placed an affirmative obligation on the Defendant to release all obligations, and this duty is operative.[2] The entire purpose of the bankruptcy proceeding, the Agreed Order between the parties, and the reorganization of Spiece Sales was to relieve some of the financial pressures and burdens on the company so that it might be able to continue on in business. An integral part of helping Spiece Sales survive was clearing the holdings or claims from their records as much as possible so it might be able to obtain much-needed financing. For there to be continued liens on the inventory of Spiece Sales frustrated this objective and was contrary to the terms of the Agreed Order, as the liens indicated that there was a "further obligation" owed by Spiece Sales to Bank One.

The Court finds that the Defendant was in breach of the Agreed Order soon after January 18, 2002, the date that the Bankruptcy Court entered an order confirming Spiece Sales' Amended Plan of reorganization. This Plan approved and adopted the terms of the Agreed Order, and the Defendant admits that the Plan, as confirmed, "expressly extinguished Bank One's claims and liens." (Def.'s Mem. for Summ. J. at 6.) In failing to remove the liens, the Defendant frustrated the objectives of

---

[2] Mr. Spiece's breach of contract claim is premised on the belief that Bank One had a contractual duty to assign the security interests over Spiece Sales' inventory to him upon payment of the agreed amount. (Amd. Compl., ¶ 88–92.) While section "g" of the Agreed Order, which provided the Plaintiffs an "installment payment option," contained a transfer-of-interest provision, the cash payment option chosen by Spiece Sales did not. Mr. Spiece did not respond to this point after it was raised by the Defendant and appears to concede the argument. The Defendant is entitled to summary judgment insofar as Mr. Spiece seeks recovery in his personal capacity for breach of contract.

the Agreed Order and breached the terms of this court-approved contract.

The Defendant argues that it is entitled to summary judgment regardless of any such breach because the Plaintiffs failed to mitigate damages. In a breach of contract case, damages are measured by the actual harm suffered by the breach. *See Willie's Const. Co. v. Baker*, 596 N.E.2d 958, 961 (Ind. Ct. App. 1992) (quoting *Rest. 2d of Contracts* § 347(a)). The non-breaching party must not be placed in a better position than he would be had the contract been fulfilled. *Sheppard v. Stanich*, 749 N.E.2d 609, 611 (Ind. Ct. App. 2001). As a general rule, the non-breaching party must mitigate its damages, and the breaching party has the burden to prove that the non-breaching party has not used reasonable diligence to mitigate such damages. *Id*. at 612.

Here, the Defendant proffers multiple ways in which the Plaintiffs failed to mitigate damages. First, the Defendant cites the Plaintiffs' failure to deliver a timely General Release under section "k" of the Agreed Order as one way that the Plaintiffs were responsible for the delay in having the liens lifted. However, the Plaintiffs submitted a General Release to the Defendant on November 9, 2001, which was prior to the reorganization vote on December 26, 2001, and the bankruptcy court's approval on January 18, 2002. At that point, the Defendant's failure to lift the liens over Spiece Sales' inventory was the only unperformed material element of the Agreed Order.

Second, the Defendant argues that Spiece Sales' failure to submit formal requests to lift the UCC statements constituted a failure to mitigate damages. However, as discussed above, the Defendant had a contractual duty to lift the liens over the Plaintiff's inventory, and the Defendant cannot use the defaults of the UCC to impose obligations upon the Plaintiffs that circumvent the contractual agreement between the parties.

The Defendant's final argument for the Plaintiffs' failure to mitigate damages is that the

Plaintiffs did not notify Tower Bank of the March 12, 2002, termination statements until May 20, 2002. The Defendant argues that if the Plaintiffs truly needed financing for their business, the Plaintiffs should have notified Tower Bank of the now-free state of their inventory in a much more timely manner. Although the Plaintiffs do not address this charge directly in their briefs, Mr. Spiece stated in his affidavit, "After the Bank released its [original] lien, I resumed negotiations for a credit line note to purchase current inventory to keep the stores open." (Spiece Aff. ¶ 14.) No specific dates are provided, but, interpreting this and all evidence in the Plaintiffs' favor, the Court believes it is inappropriate to block all breach of contract claims for failure to mitigate damages. The breach of contract by the Defendant necessitates a jury determination of damages, and the jury can evaluate the avowed steps taken by the Plaintiffs to secure financing after the liens were lifted and the asserted chain of causation between the liens and the closure of the Mishawaka store.

**(2)** *Breach of Contract for the Continuation Statements*

By March 12, 2002, the day that the Defendant filed the belated termination statements with the Secretary of State's office for the liens over Spiece Sales' inventory, the Agreed Order ceased to control the dealings between the parties. The Defendant breached the Agreed Order by not releasing the liens in a timely manner, but the subsequent continuation statements filed with the Secretary of State's office do not cause a second, delayed breach of this contract. Thus, the Court agrees with the Defendant that any claims based on events subsequent to March 12, 2002, must arise in tort rather than in contract.

-12-

## B. Negligence

Spiece Sales alleges that the Defendant was negligent in failing to release the liens after the completion of the bankruptcy proceedings and in filing the continuation statements after the liens were belatedly lifted. To prevail on a negligence claim, Spiece Sales must prove (1) the existence of a duty on the part of the defendant to conform its conduct to a standard of care arising from its relationship with the plaintiff, (2) a failure of the defendant to conform its conduct to the requisite standard of care required by the relationship, and (3) an injury to the plaintiff proximately caused by the breach. *Webb, M.D. v. Jarvis*, 575 N.E.2d 992, 995 (Ind. 1991). The duty can arise from a contractual relationship. *Id.* (noting that the duty of a physician to his patient arises from the contractual relationship between the two of them).

### (1) *Negligence in Failing to Lift the Original Liens*

Whether the Defendant was negligent in failing to remove the liens from Spiece Sales' inventory is a separate inquiry from whether the Defendant breached the Agreed Order by not lifting the liens in a timely manner. "Generally, a breach of contract is not a tort." *INS Investigations Bureau v. Lee*, 784 N.E.2d 566, 577–78 (Ind. Ct. App. 2003). For actionable negligence to be based on a contractual duty, the contract must "affirmatively evince[] an intent to assume a duty of care." *Hale v. R.R. Donnelley & Sons*, 729 N.E.2d 1025, 1028 (Ind. Ct. App. 2000) (citing *Williams v. R.H. Marlin*, 656 N.E.2d 1145, 1155 (Ind. Ct. App. 1995)). The contract as a whole, rather than individual paragraphs or interpretations, must be analyzed to determine the existence of a contractual duty of care. *Hale*, 729 N.E.2d at 1028.

Although the existence of a contractual duty of care depends on the existence of an affirmative intent by the parties to create such a duty, Spiece Sales does not direct the Court to any passages of the Agreed Order that indicate such an intent. Nor does Spiece Sales argue that the Agreed Order as a whole evinces an intent to create a duty of care on the part of the Defendant. The Court's independent examination of the Agreed Order finds no indication that the parties intended to impose a duty of care on the Defendant. Without such a clear duty of care, Spiece Sales' negligence claim for the Defendant's failure to lift the original liens cannot proceed.

**(2) *Negligence in Filing the Lien Restatements***

Filing a lien on the legally unencumbered property of another appears to be a *res ipsa loquitor* case of negligence, insofar as there is a general duty not to file claims of interest upon another's property.[3] Before a Plaintiff may recover on the basis of *res ipsa loquitor*, evidence must be presented showing that (1) the instrumentality was under the exclusive control of the Defendant, and (2) the accident is one that ordinarily does not occur if those in control of the instrumentality use proper care. *Cergnul v. Heritage Inn of Ind.*, 785 N.E.2d 328, 331 (Ind. Ct. App. 2003). Here, the Defendant acknowledges that the continuation statements filed on August 6, 2002, were filed by a subordinate instrumentality of the Bank, the liens were filed in error, and the Bank did not in fact have a cognizable interest in Spiece Sales' inventory. In light of the duty not to wrongly encumber Spiece Sales' title and the Defendant's admission of wrongdoing, Spiece Sales' negligence claim for the second liens survives summary judgment.

---

[3]The only context readily apparent to the Court, where one may file claims of interest in another's property and not violate this duty, occurs when a rival claimant in a real-property boundary dispute asserts, in good faith, an interest in property that is actually owned by another. *See Rstmt. 2d of Torts* § 646 (1977).

-14-

The Defendant argues that the second liens had no "legal effect" because the Bank did not in fact have a legal right to Spiece Sales' inventory. This argument is unconvincing. Though these liens may not have resulted in a legal benefit to the Defendant, it appears that the second liens had the practical effect of causing Tower Bank to deny Spiece Sales' loan applications and, as a result, caused Spiece Sales to close a store for lack of inventory. While these causation and damages issues are properly left for the jury, the Defendant cannot validly claim that the liens had no effect as a matter of law.

The Defendant makes the additional argument that they satisfied any duties to the Plaintiffs by filing termination statements twenty days after receiving a written request by Spiece Sales. The Defendant appropriates the "twenty days" standard from Indiana Code § 26-1-9.1-513, which provides a twenty-day window for the filing of UCC termination statements after the reception of an authenticated demand from the debtor. This argument does not aid the Defendant in their motion for summary judgment on the claim of negligence: the negligent act here was filing illicit liens on Spiece Sales' property, not negligence in failing to remove the liens. As these liens had no basis in law, the statutory safe-zone for removal of liens is inapplicable.

(a) *Causation*

The Court recognizes that even if the Defendant did not breach the contract or commit negligence, Spiece Sales may have been denied their loan applications nonetheless. Spiece Sales' recovery for actual harm suffered by any breach of contract or negligence requires a determination that Spiece Sales suffered a "lost opportunity" to secure financing. The Parties do not argue the legal standards for determining causation and damages for such a lost business opportunity. However, as

one respected treatise has noted, "Where a breach of contract involves deprivation of a chance that has value in a business sense, an understandable and just reluctance will be felt by most courts to deny altogether the recovery of substantial damages." 24 *Williston on Contracts* § 64:10 (4th ed. 2004 supp., Richard A. Lord, ed.). The Record presents questions of fact for a jury: Did either the Defendant's breach of contract or negligence, or both, cause the lost financing and pecuniary harm suffered by Spiece Sales?

(b) *Damages*

The Defendant argues that the calculation and amount of damages Spiece Sales could request in this suit are so speculative as to be insufficient as a matter of law. Specifically, the Defendant argues that Spiece Sales failed to designate an expert to estimate damages and had no reliable basis for estimating its lost profits.

A party may not recover damages for breach of contract beyond that which is supported by the evidence with reasonable certainty. *Restatement (Second) of Contracts* § 352 (1981). Spiece Sales must demonstrate greater certainty as to the harm suffered under breach of contract than it must demonstrate to recover for any negligence by the Defendant. *Id*. at comment a; *see also Restatement (Second) of Torts* § 912 (1979). When there are doubts as to the certainty of harm suffered, such doubts are generally resolved against the breaching party. *See Restatement (Second) of Contracts* § 352, comment a. "Lost profits are not uncertain where there is testimony that, while not sufficient to put the amount beyond doubt, is sufficient to enable the factfinder to make a fair and reasonable finding as to the proper damages." *Marathon Oil Co. v. Collins*, 744 N.E.2d 474, 482 (Ind. Ct. App. 2001). A damage award does not require any specific degree of certainty, so long as

-16-

the amount awarded is supported by the evidence and is not based on speculation or conjecture. *Turbines, Inc. v. Thompson*, 684 N.E.2d 254, 258 (Ind. Ct. App. 1997) (citing *Nat'l Advertising Co. v. Wilson Auto Parts, Inc.*, 569 N.E.2d 997 (Ind. Ct. App. 1991)).

Mr. Spiece would testify in this case as a lay witness with particularized knowledge of his business and affairs surrounding this situation. An owner of property is allowed to testify as to the value of his property, provided he has a clear basis for the methods and figures used in that calculation. *Court View Centre v. Witt*, 753 N.E.2d 75, 82 (Ind. Ct. App. 2001). Mr. Spiece argues that the Mishawaka and Fort Wayne stores, had they not closed because of the Defendant's breach of contract and negligence, "would have generated a combined net profit based on a historic profit rate of 5%, of $395,000." (Pl.'s Resp. Br. at 16.) Mr. Spiece furthermore states that the value of his business decreased by $1.975 million, calculated by multiplying the above lost profits of $395,000 by the "standard" multiplier of "five times the earnings." *Id.* (citing Spiece Aff. ¶ 20). Though the basis and reliability for Mr. Spiece's calculations are not clearly established in this Record, neither are the figures mere speculation or conjecture. The Defendant does not present caselaw or legal standards for why this evidence is legally insufficient in itself, and instead relies on contrary evidence that the business was in fact losing money. From the figures presented and developed at trial, where Mr. Spiece's calculations are subject to cross-examination, a jury can determine whether Spiece Sales suffered recoverable damages. Examining the evidence in the light most favorable to the Plaintiffs, summary judgment on the issue of damages is premature.

The Defendant also argues that Spiece Sales ought to be evaluated as a "new venture," as their increased Internet sales, bankruptcy, and store closings have arguably changed the essence of the business. While the Defendant directs the Court to jurisdictions that have adopted the "new

business rule," Indiana is not among them. *Cf. MindGames, Inc. v. W. Pub. Co.*, 218 F.3d 652, 656 (7th Cir. 2000) (finding that "[t]he 'new business' rule has, moreover, been abandoned in most states that once followed it" and "newness" should be just one factor in the determinative inquiry of undue speculation in estimating damages). Additionally, even when evaluating a new business, "some degree of speculation is permissible in computing damages, because reasonable doubts as to remedy ought to be resolved against the wrongdoer." *Id*. at 658 (quoting *Jones Motor Co. v. Holtkamp, Liese, Beckemeier & Childress, P.C.*, 197 F.3d 1190, 1194 (7th Cir. 1999)). The Defendant's assertion that the changes in Spiece Sales' operations make it a "new venture" for which recovery for lost profits is barred as a matter of law is not backed by Indiana law.


### C. Slander of Title

In Indiana, the elements of a slander of title action are that false statements were made, with malice, and that the plaintiff sustained pecuniary loss as a necessary and proximate consequence of the slanderous statements. *Morris v. Rassel, Inc.*, 576 N.E.2d 596, 599 (Ind. Ct. App. 1991). The essence of a slander of title claim is that an unfounded claim is made by one party concerning the ownership or security interest in property of another party, resulting in a financial loss to the rightful owner. *Display Fixtures, Inc. v. R.L. Hatcher, Inc.*, 438 N.E.2d 26, 31 (Ind. Ct. App. 1982).

Spiece Sales alleges that the Defendant demonstrated actual or inferred malice when it failed and refused to release its lien interests against Spiece Sales and caused the continued publication of a false statement about the status of the title of Spiece Sales's assets.  Spiece Sales argues that it suffered loss of loan proceeds, loss of sales at its Fort Wayne and Mishawaka Stores, and loss of the entire going concern value of those stores and their profits as a result of the Defendant's slander of

title.

False liens may be "false statements" as a matter of law. *See Lee & Mayfield, Inc. v. Lykowski House Moving Eng'rs, Inc.* 489 N.E.2d 603, 608–09 (Ind. Ct. App. 1986) (finding that a maliciously-filed lien may constitute a "false statement" sufficient for a slander of title suit). Here, the continued liens on Spiece Sales' inventory between January 18, 2002, and March 12, 2002, are "false statements," insofar as the Plaintiffs had paid the Defendant the contractually-agreed amount to clear the title on its inventory and the Defendant had no right to the interest claimed. However, Spiece Sales' recovery for slander of title requires a finding of malice on the part of the Defendant.

Malice necessary to support a slander of title claim is "publishing matter with knowledge that it is false or with reckless disregard as to whether it is false or not," and may be inferred by the trier of fact from the evidence. *Id*. Here, Spiece Sales has not presented or suggested the presence of evidence sufficient for a jury to find malice on the part of the Defendant. Though the Plaintiffs have attempted to paint the Defendant as having acted maliciously or knowingly contrary to the interests of the Plaintiff, any malice is so speculative as to be insufficient as a matter of law.

The Plaintiffs give three examples of the Defendant's ill-will toward the Plaintiffs. First, Mr. Spiece stated in his deposition that an attorney for Bank One told him, "[W]e're willing to do anything to make sure you don't go forward." (Spiece Dep. at 153, ¶¶ 19–20.) When asked if he knew what this meant, Spiece testified:

> I didn't know. I didn't know. Well, I found out later, when they decided to seize my inventory, they were willing to go to the local judge and make the statement that I was taking money out of the business, and bleeding my company dry for my personal advantage. And low and behold there was $800,000 that I apparently missed in my account, and didn't get it out of there. So it told me they were willing to do just about anything to blow me out before the end of the year. I mean, they took me out right during the holiday season. I mean, that's when all my money comes rolling back in.

> I had actually started paying them. I shot them a $50,000 check, and was starting to pay them down, but I could see that it was important for them to get me out before the end of the year. They had to get me out of there.

(Spiece Dep. at 153–54, ¶¶ 22–11.) It is uncontested that this alleged statement from the Defendant's attorney came before the parties had reached any agreements satisfying the Plaintiffs' original bankruptcy and indebtedness to the Defendant. At that time, the Plaintiffs owed the Defendant over three million dollars, and the bank was concerned that this money be recovered. When asked about the context of this statement or for any other examples of the Defendant's ill-will toward the Plaintiffs, Mr. Spiece stated that, while he thought that the above statement was "plenty" to prove that they sought to see him fail, "I could probably come up with some things if I thought about it, but that's enough for me." (Spiece Dep. at 154, ¶¶ 14, 16–17.)

Second, the Plaintiff points to the fact that after the Defendant was made aware of the continuation statements and unwarranted liens in August 2002, the Defendant waited a full twenty days after receiving the Plaintiff's letter to file the UCC termination statements with the Secretary of State's office. The Plaintiffs asserts that, if the Defendant were truly acting in good faith, it would have filed the termination statements promptly instead of waiting twenty days until the end of an assertedly-applicable statutory safe-haven.[4]

The final piece of evidence to which the Plaintiffs direct the Court as evidence of the Defendant's bad faith is the conversation that Mr. Spiece had with a Bank One employee on September 28, 2002, during which the employee informed Spiece that the Bank's records indicated that he still owed the Bank over $1.5 million. The 2001 bankruptcy proceedings in fact cleared

---

[4]The Defendant claims that Indiana Code § 26-1-9.1-513 applied and gave them twenty days to file UCC statements after receiving an authenticated demand from the Plaintiffs. However, as these liens were not legal, enforceable instruments (as the Defendant acknowledges), the statute has no relevance. Regardless of its applicability, the Plaintiffs seek to demonstrate bad faith due to the Defendant's delay, not statutory deficiency.

Spiece of this debt, and the Plaintiffs allege that this information, combined with the Defendant's other acts, demonstrate malice toward the Plaintiffs.

The entirety of the evidence presented by the Plaintiffs, taken in the light most favorable to them, suggests that the Defendant used aggressive language in the context of the original bankruptcy negotiations, that the Bank used the full length of the time they believed they were allowed to lift the re-filed liens, and that it failed or refused to update their internal records of the Plaintiffs' indebtedness to Bank One. None of this evidence demonstrates that they operated out of malice toward the Plaintiffs. Summary judgment on the slander of title claim is therefore appropriate.

**D. Conversion**

Spiece Sales alleges that the lien interest for which Bank One had recorded its financing statement with the Indiana Secretary of State is an interest in property and may not be extinguished or destroyed without due process of law. Spiece Sales contends that the Defendant wrongfully exercised dominion and control over Spiece Sales' right in property to the exclusion of Spiece Sales, thereby committing tortious conversion in violation of Indiana Code § 35-43-4-3.

Under Indiana Code § 34-24-3-1, a person who proves the elements of criminal conversion by a preponderance of the evidence may recover up to three times the actual damages, the costs of the action, and reasonable attorney's fees. Indiana Code § 35-43-4-3 provides that "[a] person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion." "Exert control over property" is defined in § 35-43-4-1, among other things, as "encumbering . . . property." A lien is a "claim, *encumbrance*, or charge on property for payment of some debt, obligation or duty." *Black's Law Dictionary* 922 (6th ed.1990) (emphasis added). The

Bankruptcy Code defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." 11 U.S.C. § 101(37).

While the above definitions suggest that the illicit liens over Spiece Sales' inventory could constitute conversion, Indiana caselaw requires use or benefit by the tortfeasor in an action for conversion. "[U]nder Indiana law, conversion is 'a tort involving the appropriation of the personal property of another to the tortfeasor's own use and benefit.'" *Campbell v. Chappelow*, 95 F.3d 576, 579 (7th Cir. 1996) (quoting *Shoureck v. Stirling*, 691 N.E.2d 1107, 1109 (Ind. 1993)). Here, although the illicit liens over Spiece Sales' inventory may have encumbered that inventory and potentially caused detrimental effects on the Spiece Sales' efforts to secure financing, there was no "use" of this interest by the Defendant. A lien is a claim or interest in property but does not constitute a use of the property, nor impart a true benefit upon the lienholder, absent maturation of the interest. Thus, whatever the detrimental effects on Spiece Sales' efforts at securing financing, the illicit short-term liens do not constitute conversion of Spiece Sales' inventory and summary judgment is appropriate

### E. Tortious Interference with Business Relationships

Spiece Sales alleges that the Defendant intentionally interfered with the relationship between Spiece Sales and Mr. Spiece, who leased store space to Spiece Sales, by slandering title to the assets of Spiece Sales and causing its inability to obtain financing through a line of credit necessary to maintain its business operations. This prevented Spiece Sales from making lease payments to Mr. Spiece for the Fort Wayne Store, resulting in a breach of the lease and loss of the use of the Fort Wayne facility. Mr. Spiece claims that as a direct and proximate result of the Defendant's actions,

he lost the proceeds of lease payments from Spiece Sales and was forced to pursue the sale of Spiece Fieldhouse.

In Indiana, the elements of a claim for tortious interference with business relationships are: (1) the existence of a valid relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from defendant's wrongful interference with the relationship. *Levee v. Beeching,* 729 N.E.2d 215, 222 (Ind. Ct. App. 2000). Illegal conduct is also an essential element of tortious interference with a business relationship. *Id.*; *The Osler Inst., Inc. v. Forde*, 333 F.3d 832, 839 (7th Cir. 2003) ("While intentional interference with *contractual* relationships does not require illegal conduct, intentional interference with *business* relationships does."); *Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553, 556–57 (S.D. Ind. 1988).

Indiana courts have not defined "illegal" conduct in the context of a tortious interference claim. However, courts interpreting Indiana law have held that non-criminal illegal acts are sufficient. *See United States v. FKW Inc.*, 997 F. Supp. 1143, 1153 (S.D. Ind. 1998); *Moffett v. Gene B. Glick Co.*, 604 F. Supp. 229, 239 (N.D. Ind. 1984), *overruled on other grounds, Reeder-Baker v. Lincoln Nat'l Corp.*, 644 F. Supp. 983 (N.D. Ind. 1986). However, defamation is not sufficiently illegal to support an intentional interference with business claims. *Levee*, 729 N.E.2d at 222. If defamation, or slander of title, which requires malice, is not sufficient to support such a claim, it logically follows that a claim that the Defendant negligently breached a duty would not be sufficient.

The Court previously notified the parties in this suit that for the tortious interference with business relationships claim to stand, it must rest on the underlying illegal conversion. As the Court has above determined the Defendant is entitled to summary judgment on Spiece Sales' conversion

claim, the Plaintiffs' tortious interference claims are subject to summary judgment as well.

## CONCLUSION

For the above reasons, the Defendant's motion for summary judgment is DENIED for Count V (Breach of Contract) of the Plaintiffs' Amended Complaint insofar as the claims address the original liens for the period between January 18, 2002, and March 12, 2002.  Summary judgment is also DENIED for Count I (Negligence) insofar as it addresses the second liens for the period between August 6, 2002, and October 8, 2002. Summary judgment is GRANTED on all other counts, including all counts brought by Mr. Spiece in his personal capacity.

SO ORDERED on July 7, 2005.


_____S/ Theresa L. Springmann_____
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT